UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| CHRISTOPHER TATE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:04-CV-379 |
| MICHAEL WENGER, individually and in | ) | |
| official capacity; JEFF LANCASTER, | ) | Judge Curtis L. Collier |
| individually and in his official capacity; JOHN | ) | |
| DOES, City of Chattanooga Police Officers; | ) | |
| RON ROES, City of Chattanooga Police | ) | |
| Supervisors, individually and in their official | ) | |
| capacities; and THE CITY OF | ) | |
| CHATTANOOGA, a Tennessee Municipal | ) | |
| Corporation; | ) | |
| | ) | |
| Defendants. | ) | |

## M E M O R A N D U M

This case brought pursuant to 42 U.S.C. § 1983 is set for trial on Monday, June 12, 2006.

A Final Pretrial Conference with counsel was held on Wednesday, May 31, 2006 in the Court's

chambers. At that conference a number of outstanding motions were discussed, among them

summary judgments motions filed by Defendant Michael Wenger ("Wenger")(Court File No. 31)

and by Defendants Jeff Lancaster ("Lancaster"); John Doe, Officers; Ron Roe Supervisors, and the

City of Chattanooga, Tennessee ("the City") (Court File No. 34). The Court announced the parties

could anticipate the § 1983 claims against Defendant Wenger and Defendant Lancaster in their

individual capacities would remain as well as the state law claim for assault and battery against

Defendant Wenger. The Court also stated a written decision of the summary judgment motion

would be issued prior to the date set for trial. This is that written decision.

Plaintiff Christopher Tate ("Plaintiff") brings this action based upon events surrounding his arrest by officers of the Chattanooga, Tennessee Police Department in December 2003. He claims he was subjected to excessive force when arrested and ill treated when he was hospitalized subsequent to the arrest. Plaintiff's complaint asserts federal claims and state law against Wenger and Lancaster; unnamed Chattanooga Police officers and supervisors; and the City of Chattanooga, Tennessee (collectively "Defendants"). This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and it may exercise supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

The Court has carefully considered all of the arguments advanced in the parties memorandums filed in support and in opposition to the motions for summary judgment.[1] Considering these arguments and the applicable law, the Court will **GRANT** the motions in all

---

[1] On April 27, 2006 Plaintiff filed a supplemental brief in opposition to Defendants' motions for summary judgment (Court File No. 48). Plaintiff did so without permission of the Court. Local Rule 7.1(d) instructs the parties not to file any additional briefs, affidavits, or other papers "without prior approval of the court, *except* that a party may file a supplemental brief . . . to call to the court's attention developments occurring *after* a party's final brief is filed." E.D. TN L.R. 7.1(d) (emphasis added). Under the rule, a party need not receive permission from the Court when the supplemental brief makes the Court aware of developments after a party's final brief. Plaintiff's supplemental brief does make the Court aware of developments that occurred after the final brief but it also addresses issues on which there were no new developments after the final brief. Therefore, a portion of Plaintiff's brief violates Local Rule 7.1(d). Nonetheless, the Court will consider it in deciding Defendants' motions for summary judgment.

On May 17, 2006 Plaintiff filed another supplemental brief without permission of the Court (Court File No. 63). This brief updates the Court on developments that occurred after Plaintiff's final brief. Specifically, the brief concerns the deposition testimony of Wenger. Previously, the Court denied Plaintiff's request to amend his response in opposition to the Defendants' motions for summary judgment so Plaintiff could use Wenger's deposition testimony (Court File No. 46). The current brief is essentially an attempt by counsel to amend Plaintiff's response brief to include Wenger's testimony. Despite this, the Court has considered the facts and arguments raised in the brief and determined it does not change any of the Court's analysis or conclusions in this memorandum.

respects with the exception of the § 1983 claims against Wenger and Lancaster in their individual capacities and the state law assault and battery claim against Wenger, the punitive damage claims against Wenger and Lancaster.

## I.     STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994); *Kentucky Div., Horsemen's Benevolent & Prot. Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1411 (6th Cir. 1994). The Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Oakland Gin Co. v. Marlow*, 44 F.3d 426, 429 (6th Cir. 1995); *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 250 (6th Cir. 1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benevolent*, 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 404-06 (6th Cir. 1992) (holding courts do not have the responsibility to search the record *sua sponte* for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the

3

moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benevolent*, 20 F.3d at 1411.


## II.    **RELEVANT FACTS**

As one would expect in a case of this type where law enforcement officers encounter someone involved in criminal activity, and a law suit results, the parties vigorously dispute the relevant facts. According to Defendants Plaintiff "is a self confessed crack cocaine addict." (Court File No. 32, p.2). Defendants allege Plaintiff was engaged in a three or four day criminal escapade involving stolen cars, consuming crack cocaine, efforts to purchase crack cocaine both to use and sell, and theft of crack cocaine. Plaintiff's criminal adventures culminated in Chattanooga, Tennessee on December 8, 2003 when Plaintiff, driving the stolen car, attempted to escape from chasing officers. Unable to escape, Plaintiff stopped the stolen vehicle and on foot tried to avoid

4

capture. Wenger was the closest officer to Plaintiff and was the one who made the arrest. According to Defendants, Plaintiff resisted arrest and fought the arresting officers. They deny using excessive force. They also deny withholding needed medical care from Plaintiff when he was in the hospital.

Plaintiff's version of the facts is starkly different. Under the standard for reviewing a summary judgment motion, the Court is obligated to discount Defendants' version of the facts, unless admitted by Plaintiff, or uncontroverted, and accept Plaintiff's version. Viewed in the best possible light for Plaintiff, the nonmoving party, the facts are as follows.

On or about December 5, 2003 through December 8, 2003, Plaintiff, along with his friend Ricky Baker ("Baker"), traveled from Chattanooga towards Nashville, Tennessee and back in an attempt to sell a stolen car and to find drugs (Court File No. 32, Part 2, Court File No. 34, Part 2, Court File No. 39, Part 2, Deposition of Christopher Tate ("Tate Dep.") pp. 153, 161-63). On December 9, 2003 Plaintiff was driving the stolen vehicle in Chattanooga and Baker was riding in the passenger seat (*Id.* at pp. 182, 199). A Chattanooga Police Department ("CPD") vehicle pulled behind the stolen car and began following Plaintiff and Baker (*Id.* at p. 199-200). After Plaintiff and Baker were followed by the CPD vehicle for a while, the operator of the vehicle turned on its blue lights but Plaintiff kept driving (*Id.* at p. 203). Shortly thereafter this car was joined by approximately four other police cars and they all began pursuing Plaintiff (*Id.* at p. 206). Eventually, in an effort to evade the police, Plaintiff turned right on a dead-end street, stopped the car, jumped out, and started running away from the police officers (*Id.* at p. 210-11). After running about 20 or 30 feet away from the car, Plaintiff saw he was running towards a dead end. Upon seeing the dead end, Plaintiff "stopped, turned around, threw [his] hands up" and said, "I give up, I give up" (*Id.*

5

at pp. 219-20). Then, Wenger hit Plaintiff in the face with his fist causing him to fall to the ground face first (*Id.* at pp. 223-24). Wenger proceeded to get on top of Plaintiff and hit him on the side of the face, the back of his head, and across his back (*Id.* at p. 226). Some of the other officers ran up to the place where Wenger was hitting Plaintiff.[2] One or more of these officers and/or Wenger stepped on Plaintiff's legs, kicked his ribs, and pulled his right arm behind his back (*Id.* at pp. 226, 235; Court File No. 39, Affidavit of Christopher Tate ("Tate Aff.") ¶ 5). One of the officers remarked, "Okay, that's enough, not so hard" (Tate Dep. at p. 229). Plaintiff was handcuffed (*Id.*). After he was handcuffed, Wenger and two other officers threw Defendant into a wall and Wenger punched Plaintiff in the face (Tate Aff. at ¶ 5).

Plaintiff was then placed in the back of a patrol car and transported to Erlanger Medical Center ("Erlanger") and admitted to the emergency room (*Id.* at ¶ 7; Tate Dep. at 242-43, 248). While Plaintiff was being transported to Erlanger, Wenger commented "you got an a** whipping for running on me" and it was a "policy that if you run from the Chattanooga police you get an a** whipping" (Tate Dep. at p. 246, 262; *see* Tate Aff. at ¶ 7). During the first day of Plaintiff's hospital stay, more than one officer stayed at his bedside and when Plaintiff asked to use the phone an officer explained he could not because he was incarcerated (Tate Aff. at ¶ 8). At some point, Plaintiff was taken to a private room and handcuffed to the bed (*Id.* at ¶ 8; Tate Dep. at p. 246). Wenger then apologized for beating Plaintiff and told him he "must have weak bones" (Tate Dep. at p. 247; Tate Aff. at ¶ 7).

During his five-day stay in the hospital, Plaintiff was given morphine to ease his pain (Tate

---

[2] Plaintiff describes two of the assisting officers as follows: "One of them is black with gray pepper hair, short" and the other as small framed with short black hair (Tate Dep. at 234-36).

Dep. at pp. 257-58; Tate Aff. at ¶ 8). An officer, whom Plaintiff believes was Lancaster, withheld

water from Plaintiff and would not allow him to call for the nurse when he needed more morphine

(Tate Aff. at ¶ 8). After Plaintiff had spent three days in the hospital, the police officers uncuffed

Plaintiff and left the hospital (*Id.*). As a result of the beating, Plaintiff suffered four broken ribs, a

broken cheek bone, a broken nose, a collapsed lung, numerous contusions, and hemorrhaging (*Id.*

at ¶ 9).

When the officers left the hospital, Defendant called his wife, Regina Tate (Tate Aff. at ¶ 8).

Mrs. Tate called the "office of the Mayor, the office of the Chief of Police and the Office of Internal

Affairs," with whom she left messages (Court File No. 39, Part 3, Regina Tate Affidavit ("Regina

Tate Aff.") at ¶ 6). An unnamed woman from the Internal Affairs office called Mrs. Tate back and

explained if Mrs. Tate wanted to make a complaint she would need to come to the department to fill

out a complaint form in person (*Id.* at ¶ 7). This response was in accordance with the Internal

Affairs policy requiring citizens to fill out complaints in person and in writing (Court File No. 34,

Part 8, Affidavit of Mark Rawlston ("Rawlston Aff.") ¶ 2; Court File No. 41, Exh. 1, p. 10; Court

File No. 44, p. 6). Mrs. Tate also called the CPD to find out if Plaintiff was under arrest and to

complain about the beating. The CPD informed her there was no record of Plaintiff being arrested

but informed her there were outstanding arrest warrants for (1) evading arrest, (2) resisting arrest,

and (3) theft (*Id.* at ¶ 6).

On or about April 10, 2004, Plaintiff was arrested and charged with theft, evading arrest, and

resisting arrest (*See* Tate Aff. at ¶ 13). In February 2005 Plaintiff pleaded guilty to charges of theft

over $1,000, evading arrest, and resisting arrest in connection with the December 9, 2003 incident

(Court File No. 34, Part 3).

According to Lon Eilders ("Eilders"), the manager in charge of the accreditation and standards of the CPD, at the time of the alleged incident, the City "did not have any policy, custom, or practice of allowing its police officers to use excessive or unwarranted force on a person being taken into custody" (Court File No. 34, Part 4, Affidavit of Lon Eilders ("Eilders Aff.") at ¶¶ 1-2). The CPD has been accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA") since March 24, 2001 (*Id.* at ¶ 4).

Wenger was trained in the use of force in the police academy in 2000 and in all annual in-service training since then. This training met or exceeded the training requirements of the Tennessee POST Commission[3] and was approved by the Tennessee POST Commission prior to the time it was given (Court File No. 34, Part 11, Affidavit of Captain Mike Williams ("Williams Aff.") at ¶¶ 1-2). Similarly, Lancaster received training on the use of force at the police academy in 2001 and at annual use of force update training since then. All training provided to Lancaster on the use of force met or exceeded training requirements of the Tennessee POST Commission and was approved by the Tennessee POST Commission (*Id.* at ¶ 3). According to Captain Mike Williams, the person in charge of the training division from January 2002 through March 2005, the City did not in December 2003 have a policy, custom, or practice of training its police officers to use force on any suspect unless the officer clearly believed it was immediately necessary (*See Id.* at ¶ 4).

The City implemented a policy in July 2002 known as the Personnel Early Assistance Program (Court File No. 44, Part 2, Affidavit of Scott Dieter ("Dieter Aff.") ¶ 2; Court File No. 44,

---

[3] "Tennessee Code Annotated, Section 38-8-102 established the Tennessee peace officers standards and training commission (POST Commission). The Commission was established to develop, plan, and implement law enforcement training programs for local law enforcement officers in Tennessee, establish uniform standards and curriculum requirements for courses of study for training police officers." *Carter v. McWherter*, 859 S.W.2d 343, 345 (Tenn. Ct. App. 1993).

Parts 3 & 4, Policy Manual). Under the policy, when an officer receives five or more use of force reports[4] in any quarter, the system initiates a warning flag and early warning report (Dieter Aff. at ¶¶ 2-3; Policy Manual). This report, if generated, is reviewed by the officer's supervisors (*See Id.* at ¶ 2; Policy Manual). Lancaster had five use of force reports between July 27, 2003 and October 22, 2003 (Court File No. 39, Part 4, pp. 91-93). No early warning reports were generated for Wenger or Lancaster prior to December 9, 2003 (Dieter Aff. at ¶ 4).

Plaintiff filed suit against Defendants on December 4, 2004 (Court File No. 1). He alleges: (1) Wenger and other unnamed officers used excessive force when they arrested him and certain unnamed officers failed to halt the attack upon Plaintiff in violation of 42 U.S.C. § 1983 (Court File No. 2, Amended Complaint, ¶¶ 27-31, 51-54); (2) Defendants violated § 1983 when they withheld medical treatment from him while he was in the hospital (*Id.* at ¶¶ 55-59); (3) unnamed supervisors violated § 1983 because they "acted with reckless disregard and deliberate indifference in the training, supervision, investigation and discipline of the defendant officers . . ." (*Id.* at ¶¶ 48-50); (4) Defendants' actions constituted negligence, assault and battery, and negligent training and supervision under Tennessee law (*Id.* at ¶¶ 17-26); (5) Wenger, Lancaster, and the unnamed officers conspired with each other to violate Plaintiff's civil rights; and (6) the City violated § 1983 by failing to adequately train and supervise its employees, for having a policy to use excessive force, and by ratifying its officers' conduct (*Id.* at ¶¶ 39-47).

For these claims Plaintiff seeks an award of compensatory damages in the amount of $500,000, of punitive damages in the amount of $1,000,000, and damages under 42 U.S.C. § 1988

_____

[4] The parties do not explain how much force must be used for a use of force report to be completed and/or if a citizen complaint about excessive force requires an officer to fill out a report without regard to how much force is used.

9

(*Id.* at p. 12).

## III.   DISCUSSION

### A.   Individual Defendants

#### 1.   Anonymous Defendants

Plaintiff's amended complaint states causes of action against Defendants John Does, City of Chattanooga Police Officers (the "John Does") and Ron Roes, City of Chattanooga Police Supervisors (the "Ron Roes") (Court File No. 2, Amended Complaint).  At this late date, Plaintiff has not identified any of these anonymous officers or supervisors.  Therefore, Plaintiff's claims against the John Does and Ron Roes are barred by the statute of limitations.  The statute of limitations for Plaintiff's § 1983 claims is one year. *Sharpe v. Cureton*, 319 F.3d 391, 399 (6th Cir. 2003); Tenn. Code Ann. § 28-3-104(a)(4).  Similarly, Plaintiff's state law claims are governed by a one-year statute of limitations.  *See* Tenn. Code Ann. § 28-3-104(a)(1).  The events precipitating this lawsuit occurred in December 2003.  Over two years have passed since December 2003.

Although Fed. R. Civ. P. 15(c) allows a plaintiff's claim against a new party to relate back, Plaintiff has not satisfied the notice or relation back requirements of Fed. R. Civ. P. 15(c) because the John Does and Ron Roes have received neither actual nor constructive notice of Plaintiff's suit as required by Fed. R. Civ. P. 15(c)(3)[5] and 4(m).[6]  Accordingly, the Court will **DISMISS**

---

[5]  Fed. R. P. 15(c) provides in pertinent part:

(c) Relation Back of Amendments.  An amendment of a pleading relates back to the date of the original pleading when

. . .

10

Plaintiff's claims against the John Does and Ron Roes.

### 2. Wenger and Lancaster

#### (a) Section 1983 Claims Arising Out of Plaintiff's Arrest

As an initial matter, Lancaster argues he is not liable for any claims arising from Plaintiff's arrest on December 9, 2003 because he was not one of the officers who assisted Wenger in arresting Plaintiff (Court File No. 35, pp. 5-6, 15; *see* Court File No. 34, Affidavit of Jeff Lancaster

---

> (2) the claim or defense asserted in the amended pleading arose out of the conduct transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

There is no indication the unnamed officers or supervisors in this case would have any way of receiving notice of this suit or should have known Plaintiff should have brought the action against them. Rule 15(c)(3)(B)'s "requirement is not satisfied where the caption of an original complaint refers to 'John Doe' officers and, after the expiration of the applicable limitations period, an amended complaint specifically names those officers." *Dye v. City of Warren*, 367 F.Supp. 2d 1175, 1183 (N.D. Ohio 2005).

[6] Fed. R. Civ. P. 4(m) provides in part:

(m) Time Limit for Service. If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant . . . .

The John Does and Ron Roes remain unidentified and unserved.

("Lancaster Affidavit") at ¶ 2). Plaintiff does not claim anywhere in his deposition or affidavit Lancaster touched him or threatened to touch him on December 9, 2003. Further, Plaintiff does state in his brief "the assault by Defendant Lancaster is based upon his denial of pain medication . . ." (Court File No. 41, Exh. 1, p. 24). Accordingly, all federal and state claims asserted against Lancaster stemming from the events surrounding Plaintiff's December 9, 2003 arrest will be **DISMISSED**.

Now the Court will turn to Plaintiff's claims against Wenger for his involvement in Plaintiff's arrest. Defendants argue there is no § 1983 liability for the December 9, 2003 arrest because of the doctrines of qualified immunity and collateral estoppel. The Court will address each of these in turn.

### (i)      Qualified Immunity

Wenger contends he is entitled to summary judgment on Plaintiff's § 1983 claims arising from Plaintiff's arrest on the basis of qualified immunity (Court File No. 32, pp. 6-8). Qualified immunity shields governmental officials, including police officers, acting within the scope of their official duties from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Barnes v. Wright*, -- F.3d. --, 2006 WL 1506714 (6th Cir. June 2, 2006). The Court follows a three-step inquiry in determining whether an officer is entitled to qualified immunity and decides: (1) whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show a constitutional violation has occurred; (2) whether the violation involved a clearly established constitutional right of which a reasonable person would have known; and (3) whether the plaintiff has offered sufficient evidence "to indicate that what the

12

official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)).[7] Thus, government officials are shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The plaintiff carries the burden of establishing a defendant is not entitled to qualified immunity. *Cartwright v. City of Marine City*, 336 F.3d 487, 490-91 (6th Cir. 2003).

Again, the first step in the qualified immunity analysis is to determine whether a constitutional violation did, in fact, occur. Under the Fourth Amendment, individuals have a right to be free of excessive force when police make an arrest or seizure. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Whether the force employed by an officer is excessive depends on the objective reasonableness of the officer's conduct in view of the facts and circumstances confronting him. *Id.* at 397. In making this evaluation, courts look to (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396; *see also Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (stating the "*Graham* factors do not constitute an exhaustive list"). In *Graham*, the Supreme Court instructed:

---

[7] Depending on the panel, the Sixth Circuit may use the two-step approach as outlined in *Saucier v. Katz*, 533 U.S. 194 (2001), or the three-step approach outlined in *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003). *See Barnes v. Wright*, -- F.3d. --, 2006 WL 1506714 (6th Cir. June 2, 2006)(applying three-step approach); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (stating "both the two-step approach and the three-step approach can be said to capture the holding of *Saucier* . . . ."); *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (applying two-step approach); *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005) (applying three-step approach and explaining why it is not inconsistent with *Saucier*).

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

490 U.S. at 396-97. The Sixth Circuit has further instructed:

[U]nder *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). Thus, whether an officer applied unconstitutionally excessive force in a particular situation turns on what a reasonable officer would have done under similar circumstances. *See Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir. 2000).

Two of the *Graham* factors weigh in favor of Wenger. Plaintiff was actively attempting to evade capture in a stolen vehicle, then on foot. In doing so, he placed Wenger and others in danger. However, taking the totality of the circumstances into account, accepting Plaintiff's version of the facts, Wenger's actions were objectively unreasonable. According to Plaintiff, when he realized he had run into a dead end he stopped running, turned around, put his hands in the air to indicate surrender, and exclaimed at least twice "I give up." Despite this surrender position, Wenger punched him in the face causing him to fall to the ground. He then continued to beat Plaintiff even though Plaintiff was under control.[8] After Plaintiff was handcuffed, he was thrown against a wall

---

[8] In his deposition, Plaintiff admits he resisted arrest after Wenger knocked him to the ground because he tried to keep Wenger and the other officers from putting his arms behind his back (*See* Tate Dep. at pp. 225-27, 229-30). In fact, Plaintiff pleaded guilty to committing the crime of resisting arrest. Therefore, when he was on the ground, although he was under control, he actively resisted arrest. When a person resists arrest, the Court will be more deferential to the arresting

14

and punched by Wenger in the face. As a result of the beating, Plaintiff suffered four broken ribs, a broken cheek bone, a broken nose, a collapsed lung, and hemorrhaging. Under the circumstances some force was necessary but at some point Wenger's conduct became unreasonable. Thus, the facts as alleged by Plaintiff constitute a violation of Plaintiff's Fourth Amendment rights.

The second step in the qualified immunity analysis is to determine whether the violation involved a clearly established constitutional right of which a reasonable person would have known. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The unlawfulness of an action "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 741-43 (2002)). It was clearly established law in the Sixth Circuit at the time of the underlying events there is a "right to be free from excessive force . . . ." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). The Sixth Circuit has consistently held various types of force applied after the subduing of a suspect may be unreasonable. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("There was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was"); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) ("our court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line").

---

officer's decision to use force. However, if it appears a person's resistance resulted in part or entirely from the arresting officer's use of gratuitous force, the Court's deference lessens. Here, if Plaintiff's version of the facts are to be believed, he placed his arms behind his back because he was attempting to avoid or lessen the impact of the severe beating to which he was being subjected (*Id.*).

15

As for the third step, a reasonable police officer in Wenger's position would be aware, in light of the clearly established constitutional right to be free from excessive force, he should not beat a suspect who is on the ground and under control and/or beat a subdued suspect who is handcuffed and placed against a wall. Accordingly, Plaintiff has carried his burden, at this stage of the litigation, in establishing Wenger is not entitled to qualified immunity.

### (ii)    Collateral Estoppel

Defendants next attempt to defeat Plaintiff's excessive force claims is based on the doctrine of collateral estoppel[9] (Court File No. 32, pp. 9-10; Court File No. 35, pp. 23-24). Plaintiff pleaded

---

[9] The Court understands the use of "res judicata" and "collateral estoppel" are disfavored in federal courts and that "claim preclusion" and "issue preclusion" are preferred. *DLX, Inc. v. Kentucky*, 381 F.3d 511 (6th Cir. 2004); *U.S. ex rel. Spectrum Control Systems, Inc. v. Staffco Constr., Inc.*, 107 Fed. Appx. 453 (6th Cir. 2004). The Court has used the term "collateral estoppel" in this opinion where referring to the language in the parties' briefs and the Tennessee opinions. However, the Court is aware of the following admonition from the United States Court of Appeals for the Sixth Circuit:

> In the proceedings attendant to these appeals, the parties and the district court appear to have adopted the position that "res judicata" is synonymous with "claim preclusion" and "collateral estoppel" is synonymous with "issue preclusion." At this stage of the litigation, we will not disturb this usage although we will, during the course of our discussion of the legal issues, use the terms "claim preclusion" and "issue preclusion." We also express our hope that future litigants, in the interests of precision and clarity, will formulate arguments which refer solely to issue or claim preclusion and which refrain from using the predecessors of those terms, whose meanings have become convoluted.

*Barnes v. McDowell*, 848 F.2d 725, 728 n.5 (6th Cir. 1988), *quoted in Heyliger v. State Univ. Cmty. College Sys. of Tenn.*, 126 F.3d 849, 852 (6th Cir. 1997) ("The hope we expressed in *Barnes* was not realized in the arguments of the present parties, nor in the decision of the district court. We can only express the hope again.").

"Collateral estoppel is an issue preclusion doctrine devised by the courts. Like other preclusion doctrines, its purposes are to conserve judicial resources, to relieve litigants from the cost and vexation of multiple lawsuits, and to encourage reliance on judicial decisions by preventing inconsistent decisions." *Beaty v. McGraw*, 15 S.W.3d 819, 824 (Tenn. Ct. App. 1998) (citing *Allen*

16

guilty in a Tennessee criminal court to resisting arrest on December 9, 2003. Wenger and Lancaster argue if Plaintiff's excessive force claim is successful, his prior conviction for resisting arrest would be implicitly invalid.[10] *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (where the adjudication of a plaintiff's § 1983 cause of action necessarily implies the invalidity of a state court judgment of conviction, the "plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254."). Plaintiff responds by arguing his "claims under § 1983 do not in any way call into question the validity of the state court conviction . . ." (Court File No. 41, Exh. 1, p. 18).

To determine what preclusive effect should be given to Plaintiff's prior conviction for resisting arrest, the Court looks to Tennessee law on collateral estoppel. *Haring v. Prosise,* 462 U.S. 306, 314-15 (1983); *Ingram v. City of Columbus*, 185 F.3d 579, 593 (6th Cir. 1999). Under Tennessee law, once an issue has been determined by a court of competent jurisdiction, the doctrine of collateral estoppel renders that determination conclusive on the parties and their privies in subsequent litigation, even when the claims or causes of action are different. *Gibson v. Trant*, 58 S.W.3d 103, 113 (Tenn. 2001). The party invoking the doctrine of collateral estoppel has the burden of proof. *Beaty v. McGraw*, 15 S.W.3d 819, 824 (Tenn. Ct. App. 1998). To invoke the doctrine, a party must demonstrate (1) the issue to be precluded is identical to the issue decided in the earlier suit; (2) the issue to be precluded was actually litigated and decided on its merits in the earlier suit;

---

*v. McCurry*, 449 U.S. 90, 94 (1980)) (other citations omitted).

[10] Wenger additionally argues Plaintiff's conviction for evading arrest would be implicitly invalid. This argument is without merit. Plaintiff does not challenge the fact he tried to evade police. He merely claims once he stopped running, the officers used excessive force.

17

(3) the judgment in the earlier suit has become final; (4) the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier suit; and (5) the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier suit to litigate the issue to be precluded. *Id.* at 824-25.

Defendants have failed to meet all of the required elements. The issue presented in state court was not the same issue presented here. When Plaintiff pleaded guilty to resisting arrest, he pleaded guilty to violating Tenn. Code Ann. § 39-16-602, which provides:

> (a) It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at such officer's direction, from effecting a stop, frisk, halt, arrest, or search of any person, including the defendant, by using force against the law enforcement officer or another.

Thus, Plaintiff admitted he intentionally prevented or obstructed a law enforcement officer from arresting him by using force against the law enforcement officer. He did *not* admit the officers used a reasonable amount of force against him. In addition to a separate issue being presented in state court, whether the force used to arrest Plaintiff was excessive was not litigated and decided on its merits.

A case similar to the current one is *Donovan v. Thames*, 105 F.3d 291 (6th Cir. 1997). In *Donovan*, a § 1983 plaintiff who had previously been tried and convicted of resisting arrest argued the arresting officers used excessive force when they arrested him. After analyzing Kentucky law on collateral estoppel, the Sixth Circuit held the plaintiff's claim was not barred because "the issue of the officers' use of excessive force was not essential to the conviction for resisting arrest and because we have no evidence that the issue of excessive force was actually litigated in the state-court criminal proceeding . . . ." *Id.* at 292, 295. For the same reasons, under Tennessee law, collateral

18

estoppel does not preclude the portion of Plaintiff's § 1983 suit based on excessive force.[11] *See also,*

*Nelson v. Jashurek*, 109 F.3d 142, 146 (3d Cir. 1997) (stating "even if a defendant in a criminal

action was convicted validly of resisting arrest, the criminal defendant [is] not necessarily barred

from bringing a section 1983 excessive force action . . . ."). Therefore the Court will **DENY**

summary judgment on Plaintiff's § 1983 claim against Wenger in his individual capacity arising

from Plaintiff's arrest on December 9, 2003.

  **(b)**    **Section 1983 Claims Arising From Plaintiff's Medical Treatment**

   **(i)**    **Wenger**

  Plaintiff does not identify Wenger as the officer who denied him medical treatment in his

deposition or affidavit. Further, Plaintiff makes clear in his brief the allegations arising from

Plaintiff's medical treatment are against Lancaster, not Wenger (Court File No. 41, Exh. 1, pp. 6,

24). Hence, in the absence of any claims against Wenger for denial of medial treatment, the Court

will **DISMISS** all claims made against Wenger for failing to provide Plaintiff with medical care.

   **(ii)**    **Lancaster**

  Lancaster moves for summary judgment on Plaintiff's § 1983 claim against him for failure

to provide medical care arguing he did not prevent Plaintiff from receiving any medication or water.

"In order to sustain a § 1983 claim against individuals for failure to provide adequate medical care,

---

[11] The Court does note Tennessee law provides a defense to the charge of resisting arrest. In Tennessee a defendant may use force in resisting arrest where (1) the law enforcement officer uses or attempts to use greater force than necessary to make the arrest . . . and (2) the person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary. Tenn. Code Ann. § 39-11-611(e). If Plaintiff had fully litigated this defense on its merits in the prior state court proceedings and there was a finding that the law enforcement officers did not use greater force than necessary he would likely be precluded from bringing his § 1983 suit based on excessive force. *See Isibor v. City of Franklin*, 1998 WL 344078 (6th Cir. May 26, 1998) (unpublished).

a plaintiff must show that defendants acted with 'deliberate indifference to serious medical needs.'" *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)). "Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). "This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. . . . If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments." *Id.*

According to Plaintiff, while in the hospital, he was being treated with morphine for his pain. An officer, whom he believes was Lancaster, withheld water from him and would not allow him to call for the nurse when he needed more morphine. Plaintiff had serious medical conditions when he was in the hospital. In particular, Plaintiff had several broken bones and a collapsed lung. Lancaster admits standing by Plaintiff in the hospital emergency room (Lancaster Aff. at ¶ 3). Therefore, it must have been obvious to Lancaster Plaintiff had serious medical conditions. To then intentionally withhold medication for those conditions amounts to deliberate indifference. *See Mullins v. Kalns*, 2000 WL 1679511, *2 (6th Cir. Nov. 3, 2000) (unpublished) ("A prisoner can show deliberate indifference in violation of the Eighth Amendment by showing that a prison official intentionally interfered with a prescribed treatment"); *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) ("Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed"); *Byrd v. Wilson*, 701 F.2d 592, 595 (6th Cir. 1983) ("a prisoner who suffers pain needlessly when relief is

readily available has a cause of action against hose whose deliberate indifference is the cause of his suffering.").  Accordingly, the Court will **DENY** Lancaster's motion for summary judgment on Plaintiff's § 1983 claim against him for withholding medical care, and that claim will proceed to trial.

### (c)    Assault and Battery Claims

Next, Lancaster moves to dismiss any state law claim of assault and battery made against him because "Lancaster never placed his hands on [Plaintiff]" (Court File No. 35, p. 15).  Plaintiff has not presented any evidence Lancaster touched him or something intimately associated to him. Therefore, a claim of common law battery cannot lie.  *See Raines v. Shoney's, Inc.*, 909 F. Supp. 1070, 1083 (E.D. Tenn. 1995) (defining battery as "any intentional, unlawful and harmful (or offensive) contact by one person with the person of another" (quotation and citation omitted); *Huffman v. State*, 292 S.W.2d 738, 742 (Tenn. 1956) (defining battery as "[a] touching of the person . . . or something intimately associated with, or attached to, his person, for an unlawful purpose . . . ."), overruled on other grounds by *State v. Irvin*, 603 S.W.2d 121 (Tenn. 1980).

An assault in Tennessee is "an intentional attempt, or the unequivocal appearance of an intentional attempt, coupled with the present ability, or the unequivocal appearance of the present ability, to do harm to the person of another." *Raines*, 909 F. Supp. at 1083 (quotation and citation omitted); *see also Rushing v. State*, 268 S.W.2d 563, 567 (Tenn. 1954) (defining assault as "an attempt, or the unequivocal appearance of an attempt, to do a corporal injury to another, the intent to do harm being essential.").  What is critical here is the word "do."  This requires some affirmative act on the part of the tortfeasor to cause the harm.  Typically, this involves some type of striking, hitting, or doing some act that directly leads to an injury to the victim.  In this case, Plaintiff is not

alleging Lancaster set in motion anything that would cause him harm. Rather, he alleges he was already harmed and sought relief. Lancaster withheld or interfered with the relief Plaintiff sought. Plaintiff seeks to extend the concept of assault to reach situations never previously considered assaults. Plaintiff has been unable to furnish the Court with any authority for this extension and the Court declines the invitation to extend Tennessee law in this manner. Accordingly, the Court will **GRANT** Lancaster's motion for summary judgment on Plaintiff's assault claim.

### (d) Conspiracy

Plaintiff alleges Defendants conspired, in violation of § 1983, by "covering up the unlawful assault . . . creat[ing] a false story about the incident and fail[ing] to submit [a] report and . . . fail[ing] to take [Plaintiff] into custody when he was physically able as they did not want him to appear in court with his visible injuries" (Amended Complaint, ¶¶ 33-36). Wenger moves for summary judgment on the conspiracy claim because "[c]ounsel is unaware of a conspiracy action that can be brought under 42 U.S.C. § 1983" and contending Plaintiff probably meant to bring a cause of action under 42 U.S.C. § 1985 (Court File No. 32, p. 9). Plaintiff did not respond to Wenger's arguments.

After conducting its own research, the Court discovered several courts have held § 1983 may support a civil conspiracy claim under certain circumstances. *See, e.g., Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Canter v. County of Otsego*, 14 Fed. App'x 518, 524 (6th Cir. 2001) (unpublished); *Hafner v. Brown*, 983 F.2d 570, 576-77 (4th Cir. 1992); *Simpson v. Weeks*, 570 F.2d 240, 242-43 (8th Cir. 1978); *Hostrop v. Bd. of Junior College District No. 515*, 523 F.2d 569 (7th Cir. 1975); *see also* Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 2:18-26 4th ed. 2005. In *Spadagore*, the Sixth Circuit clearly stated such a theory

is permissible.

Assuming such a claim is valid, the Court then is required to examine the evidence in support of the idea that Wenger and some other person entered into an agreement to cause injury to Plaintiff in violation of § 1983. Such evidence is totally devoid from the record. In fact, according to Plaintiff some unknown officer during the beating stated that's enough, indicating disagreement with Wenger's actions. In this case there is no inferential evidence to support a conspiracy claim.

Accordingly, the Court will **GRANT** Defendants' motion on Plaintiff's § 1983 conspiracy claim.

### B.      Claims Against the City and Officers in Their Official Capacities

#### 1.      Section 1983 Claims

##### (a)      Failure to Train & Supervise

Plaintiff's amended complaint alleges the City "by and through its final policy makers, provided grossly inadequate training and supervision to its employees regarding the proper use of force" and the City "had actual or constructive notice that the failure to adequately train or supervise . . . would foreseeably result in the violation of the constitutional rights of . . . [Plaintiff]" (Court File No. 2, Amended Complaint, ¶¶ 40-41).[12]  The City argues it is entitled to summary judgment on

---

[12] Plaintiff's amended complaint alleges a § 1983 claim based on the City's failure to train and supervise. In one part of his response brief, Plaintiff shifts gears and argues the City had a policy of using excessive force as evidenced by Captain Mike Williams' statement "no policymaking official [] has ever authorized or condoned any policy or custom of using *excessive* force without probable cause" (Williams Aff. at ¶ 5 (emphasis added); Court File No. 41, Exh. 1, p. 10). This statement is a bit confusing and when read in isolation suggests police officers may have been authorized to use excessive force. However, when read in context, the Court concludes Williams' statement clearly means an increased amount of force is necessary in certain situations (*See* Williams Aff. at ¶¶ 4-5). Regardless, when questioned about the statement, Captain Williams explained there was never probable cause to use excessive force (Court File No. 39, Part 5, Deposition of Mike Williams ("Williams Dep.") at p. 25). Therefore, Captain Williams' statement,

Plaintiff's § 1983 claims because it did not fail to adequately train or supervise its officers with deliberate indifference to the consequences to Plaintiff (Court File No. 35, pp. 11-15).

A municipality cannot be held vicariously liable under § 1983 for the acts of its employees or agents. *Monell v. New York City Dep't of Social Serv.*,436 U.S. 658, 694 (1978); *Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003). Municipal liability attaches only where a constitutional violation results from the "execution of a government's policy or custom." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). In order to establish a § 1983 claim against a municipality, a plaintiff must (1) identify conduct properly attributable to the municipality, and (2) "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'r of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997).

Inadequate police training may serve as the basis for municipal liability under § 1983, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Therefore, "to be actionable, a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury." *Cherrington*, 344 F.3d at 646 (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)). Courts have generally recognized two situations in which inadequate training may be found to be the result of deliberate indifference: (1) failure to provide adequate training in light of

especially in light of his later deposition, is insufficient to establish the City had a policy or custom of using excessive force.

foreseeable consequences that could result from a lack of such instruction (*e.g.*, failing to instruct officers in the use of excessive force); or (2) failure to act in response to repeated complaints of constitutional violations by officers. *Id.*; *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

Plaintiff has failed to present the Court with any evidence that would allow the Court to conclude the City's training program is inadequate. To show inadequacy, Plaintiff merely states Wenger "tested below average during the academy on his tactical skills" (Court File No. 41, Exh. 1, p. 9; *See* Court File No. 39, Part 4, pp. 43-54, 56-63). Taken to its logical extreme, Plaintiff's argument means every law school, medical school, engineering school, college, high school and primary school conducts inadequate training because some of their students test below average. Since average commonly means the midpoint of the class, almost by definition half of the class will be below average. Even a training program that is superb must have trainees who test below average, otherwise there would not be an average. A more legitimate measure is whether the candidate met minimum standards as set by the training provider. There is no evidence Wenger did not meet or exceed the minimum required standards.

Even if the Court were to adopt Plaintiff's argument and assume that a low test score by one trainee were the equivalent of an inadequate training program, it appears Wenger only received below average marks during the first few weeks of the 26-week academy (Court File No. 44, p. 2). There is no evidence his final marks were below average. Put simply, there is no evidence before this Court that would allow it to conclude the City's training program is inadequate.

Even if Plaintiff had demonstrated the City's training program was inadequate, he has failed to meet his burden in presenting probative evidence the inadequacy resulted from deliberate indifference. To prove deliberate indifference Plaintiff relies on the following: (1) use of force

reports were not reviewed by superiors in the chain of command until 2005; (2) Wenger and Lancaster were not disciplined for use of force before December 9, 2003; (3) Lancaster was never investigated under the early warning policy, even though he had multiple use of force reports in a three-month period; and (4) the City does not investigate citizen complaints given by telephone to the Internal Affairs office. He contends each of the above "show a failure to act in response to repeated complaints of constitutional violations by a municipality's officers" (Court File No. 41, Exh. 1, pp. 10-11). The Court fails to see the logic in Plaintiff's arguments.

Although use of force reports were not necessarily reviewed by superiors in the chain of command, as evidenced by the use of force reports submitted by Plaintiff, someone in a supervisory position reviewed use of force reports prior to 2005 (*See, e.g.,* Court File No. 39, part 3, p. 75). Plaintiff's argument the City was indifferent by not disciplining Wenger or Lancaster prior to 2003 is without merit because there is no evidence Wenger or Lancaster was involved in any inappropriate behavior that warranted discipline. Surely Plaintiff is not arguing a municipality should willy nilly discipline officers who have done nothing improper merely to insulate the municipality from a future § 1983 case. Plaintiff must show the City was aware of excessive force by officers and in some manner condoned or approved of the improper action. In the failure to discipline context, a plaintiff must show a history of widespread abuse that has been ignored by the municipality in order to establish deliberate indifference. *Harris*, 489 U.S. at 397; *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). Plaintiff clearly has not done so.

Plaintiff's attempt to establish deliberate indifference because an early warning report was not generated for Lancaster also fails. The Personnel Early Assistance System is supposed to generate a report that will flag the names of officers who had five use of force reports in the previous

quarter (Policy Manual, pp. 3-4). It should be clear that merely because an officer has used force does not mean the officer has done anything inappropriate. Nor is it any indication that excessive force was used. It appears from the policy manual an officer could have five use of force reports in a three-month period but not be flagged in an early warning report because the five use of force reports were not created in the same quarter.[13] Thus, although Lancaster had five use of force reports in a three-month period, this does not suggest the City violated its policy by not flagging Lancaster in an early warning report before December 2003. Regardless, even if Lancaster had five or more use of force reports and an early warning report was not created in violation of City policy, Plaintiff has not shown a history of widespread abuse and ignorance of claims by the City. Lancaster is just one of many officers. It is significant to the Court the City has an early warning report system in place. This system shows the City is not deliberately indifferent to complaints of excessive force but has actively created a monitoring system so it can avoid having officers on the street who use too much force.

Likewise, the Internal Affairs office policy requiring citizens to make complaints in person does not show deliberate indifference. While the policy conceivably might result in a few meritorious complaints not being investigated, it is not so over-burdensome the Court must conclude the policy amounts to a conscious decision to ignore constitutional rights.[14] There are sound reasons

_____

[13] In Lancaster's case, he had five use of force reports between July 27, 2003 and October 22, 2003. If a quarter included the months of July, August, and September, a warning flag would not be generated because he only had four use of force reports in that quarter (Court File No. 39, Part 4, pp. 91-93).

[14] The Internal Affairs office was not deliberately indifferent to Plaintiff's complaint. When Plaintiff's wife called the Internal Affairs office to make a complaint she left a message. Her call was returned and she was informed she could make a complaint in person and in writing. If the City had been deliberately indifferent it likely would not have returned her call to inform her how to

why a municipality might choose to adopt such a policy. The City has a formal complaint system in place and there is no evidence complaints made within that system are being ignored or disregarded.

In sum, while a failure to act or make a serious investigation of similar incidents of constitutional violations can support a claim for municipal liability, the evidence must show "the need to act is so obvious that the [police department's] 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to [plaintiffs'] constitutional rights." *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996). The evidence presented by Plaintiff does not come close to showing the City in effect made such a conscious decision.[15] Accordingly, any § 1983 claims against the City or any officer in his official capacity based on the failure to train or supervise will be **DISMISSED**.

**(b)     Ratification**

Plaintiff contends, regardless of how the Court rules on the failure to train and supervise issue, the City is liable because it ratified Wenger and Lancaster's unconstitutional behavior. In support of this contention Plaintiff points out (1) a supervisor witnessed Plaintiff being beaten and said "that's enough"; (2) Plaintiff's wife called the Internal Affairs office, the Mayor's office and the Chief of Police office to complain; (3) a supervisor signed the use of force report that acknowledged Plaintiff had to be put in the hospital from injuries sustained when he was arrested on December 9, 2003; and (4) despite the foregoing, the incidents were never investigated and

---

properly make a complaint.

[15] The Court does note since Plaintiff has failed to establish the City's training program was inadequate or the City acted with deliberate indifference, it is clear Plaintiff has also failed to show how any inadequacy in the City's training program was a proximate cause of Plaintiff's injury.

Wenger and Lancaster were never disciplined.

The Sixth Circuit has held when a supervisor fails to investigate he, as an individual, may be subject to § 1983 liability under principles of supervisory liability. *Loy v. Sexton*, 132 Fed. Appx. 624, 627 (6th Cir. 2005) (unpublished); *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002); *Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990). Since Plaintiff has failed to name a supervisor, supervisory liability principles are not helpful to his case. Moreover, it is not at all clear from Plaintiff's testimony the person he claims said that's enough was a supervisor. Logically, such an utterance could come from any officer.

The Sixth Circuit has not held, as Plaintiff seems to argue, when a supervisor is liable under supervisory principles the municipality is also liable. If an offending supervisor is in a policy making position, then liability may attach to the municipality. *See Marchese v. Lucas*, 758 F.2d 181, 187-89 (6th Cir. 1985) (finding municipality liable because the sheriff, the official policy maker of the County in police matters, ratified unconstitutional conduct of his officers by failing to train his officers and failing to investigate). In this case, there is no evidence or even an allegation any offending supervisor or person involved was a policy making official.

To the extent a complaint was made directly to the City or a policy making official, there is no evidence the City or the official acquiesced or condoned Wenger and Lancaster's behavior. Further, Plaintiff has not presented evidence showing the City or a policy making official had any information about the alleged incidents indicating a strong likelihood Wenger and/or Lancaster violated Plaintiff's constitutional rights.[16] Thus, the City could not have ratified Wenger and

_____

[16] Mrs. Tate merely left phone messages indicating she wished to file a complaint but it is unclear what level of detail about her potential complaint she included in the messages. Also, Wenger's report of the incident does not mention he punched Plaintiff in the face or Plaintiff was

29

Lancaster's behavior when it failed to investigate.  *Doe*, 296 F.3d at 439.  Accordingly, Plaintiff's

claims against the City based on the City's ratification of Wenger and Lancaster's actions will be

**DISMISSED**.

### 2. Assault and Battery

Defendants move for summary judgment on Plaintiff's state law claims of assault and battery

made against Wenger and Lancaster in their official capacities and the City (Court File No. 32, pp.

4-6; Court File No. 35, pp. 15-17).  Under Tennessee law, governmental entities are afforded

immunity from suit for "injury proximately caused by a negligent act or omission of any employee

within the scope of his employment" where the injury arises out of certain enumerated torts.  *See*

Tenn. Code Ann. § 29-20-205.  Among the torts for which immunity is granted are false

imprisonment, false arrest, malicious prosecution, and violations of civil rights.  Tenn. Code Ann.

§ 29-20-205(2).  Immunity is not available however, for negligence that proximately causes injuries

arising from the torts of assault or battery.  *See Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73,

83-84 (Tenn. 2001) (holding intentional torts exception of  Tenn. Code Ann. § 29-20-205(2) does

not include torts of assault and battery).  However, even where governmental immunity is not

applicable a plaintiff must still prove "independent acts of negligence on the part of government

employees led to, contributed to, or allowed injuries directly resulting from the intentional acts of

another employee."  *Baines v. Wilson County*, 86 S.W.3d 575, 580 (Tenn. Ct. App. 2002).

Plaintiff alleges independent acts of negligence on the part of the City's employees but has

not identified any specific negligent acts or omissions on the part of the City or any of its other

---

beaten.  Rather, Wenger reported he could not prevent himself from running into Plaintiff and
Plaintiff resisted arrest so another officer had to help him place Plaintiff under arrest (Court File No.
39, Part 4, pp. 83-84).

employees that were the proximate cause of Wenger and Lancaster's alleged intentional torts. At the summary judgment stage, a plaintiff is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324. Because Plaintiff has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the City and Wenger and Lancaster, in their official capacity, are entitled to summary judgment. *Id.* at 323. Accordingly, Plaintiff's assault and battery claims against the City and officers in their official capacities will be **DISMISSED**.

      **C.**      **Damages**

Plaintiff cannot make a claim for punitive damages against the City under § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 248, 271 (6th Cir. 1981). Further, under the Tennessee Governmental Tort Liability Act, punitive damages are not recoverable against the City. *Tipton County Bd. of Educ. v. Dennis*, 561 S.W.2d 148, 153 (Tenn. 1978). Plaintiff admits as much when he argues punitive damages are recoverable against Wenger and Lancaster but does not argue punitive damages are permissible against the City (Court File No. 41, Exh. 1, pp. 24-25). As such, the Court will **DISMISS** any claim of punitive damages made against the City or the officers in their official capacities.

As for Wenger and Lancaster in their individual capacities, federal law permits punitive damages in § 1983 cases. *Smith v. Wade*, 461 U.S. 30, 56 (1983) (holding that a jury may aware punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"). As for Wenger on the state law assault and battery claim, punitive damages are also available. *Hodges v. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Accordingly, the Court will

**DENY** the motion for summary judgment on punitive damages with respect to Wenger and Lancaster.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' motions for summary judgment.  The Court will **GRANT** the motions and **DISMISS** (1) all claims made against the unnamed defendants; (2) all federal and state claims asserted against Lancaster stemming from Plaintiff's arrest on December 9, 2003; (3) all federal and state claims against Wenger for failing to provide Plaintiff with medical care; (4) Plaintiff's state law claims of assault and battery against Lancaster; (5) Plaintiff's § 1983 claims and state law claims of assault and battery against the City and officers in their official capacities; (6) Plaintiff's claim for punitive damages against the City and the officers in their official capacities; and (7) Plaintiff's § 1983 conspiracy claim.  Further, the Court will **DENY** Defendants' motions for summary judgment with respect to (1) Plaintiff's § 1983 claim against Wenger in his individual capacity arising from Plaintiff's arrest on December 9, 2003; (2) Plaintiff's § 1983 claim against Lancaster for failing to provide medical care; and (3) Plaintiff's claims for punitive damages against Wenger and Lancaster in their individual capacities.

An Order Shall Enter.

/s/ _____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

32